UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                            :

HARVEY & COMPANY LLC,
                            :

             Plaintiff,    :   Case No. 16-cv-3553 (AT)

                            :

      –against–        :   ECF Case

                            :

MIDOCEAN US ADVISOR, LP,
                            :

             Defendant.    :

-----------------------------------------------------------------x

**MEMORANDUM OF LAW OF DEFENDANT MIDOCEAN US ADVISOR, LP IN
SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Mark S. Cohen
Daniel H. Tabak
Sang Min Lee
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 957-7600 Main
(212) 957-4514 Fax

*Attorneys for MidOcean US Advisor, LP*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 3

ARGUMENT ................................................................................................................................ 8

I.  LEGAL STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS ............ 8

II.  HARVEY IS NOT ENTITLED TO ANY FINDER'S FEE BECAUSE
MIDOCEAN DID NOT INCUR AN OBLIGATION TO PAY A FINDER'S FEE
DURING THE CONTRACT'S TERM. ............................................................................... 9

III.  HARVEY CANNOT ESTABLISH A CAUSAL RELATIONSHIP BETWEEN ITS
ACTIONS AND MIDOCEAN'S ACQUISITION OF KIDKRAFT. ............................... 13

IV.  HARVEY IS NOT ENTITLED TO A TRANSACTION FEE UNDER SECTION 4
BECAUSE IT DOES NOT ALLEGE THAT IT MET EITHER "LAST
INTRODUCED" HURDLE. ............................................................................................... 18

A.  Harvey Does Not Attempt to Allege That It Met The First Hurdle. ..................... 18

B.  Harvey Does Not Allege A Substantive Discussion Sufficient To Meet The
Second Hurdle. ...................................................................................................... 19

CONCLUSION .......................................................................................................................... 21

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................ 8, 9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) .................................................................. 9

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 ................................................................................ 8, 9, 17

*Bison Capital Corp. v. ATP Oil & Gas Corp.,*
    10 Civ. 0714 (SHS), 2011 WL 8473007 (S.D.N.Y. March 8, 2011) ...................... 12

*Bush v. Masiello,*
    55 F.R.D. 72 (S.D.N.Y.1972) .................................................................. 8

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002) .................................................................. 9

*Cortec Indus., Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991) .................................................................. 9

*Edward Gottlieb, Inc. v. City & Commercial Commc'ns PLC,*
    606 N.Y.S.2d 148 (1st Dep't 1994)......................................................... 14

*Estronza v. RJF Sec. & Investigations,*
    No. 12-CV-1444 NGG JO, 2014 WL 5877942 (E.D.N.Y. Nov. 12, 2014) ............ 17

*Falso v. Ablest Staffing Servs.,*
    328 F. App'x 54 (2d Cir. 2009) ........................................................... 8

*Ferghana Partners Inc. v. Bioniche Life Scis. Inc.,*
    939 N.Y.S.2d 740, 2011 WL 5385095 (Sup. Ct. 2011)................................. 14

*Gebhardt v. Allspect, Inc.,*
    96 F. Supp.2d 331 (S.D.N.Y. 2000) ....................................................... 3, 15

*Goodridge v. Harvey Grp., Inc.,*
    778 F. Supp.115 (S.D.N.Y. 1991) ......................................................... 20

*Houlihan Lokey Howard & Zukin Cap., Inc. v. Protective Grp., Inc.,*
    506 F. Supp. 2d 1230 (S.D. Fla. 2007) .................................................. 12

*I. Oliver Engebretson, Inc. v. Aruba Palm Beach Hotel & Casino*,
  587 F. Supp. 844 (S.D.N.Y. 1984) ...................................................................... 20

*In re Le Cafe Creme, Ltd.*,
  244 B.R. 221 (Bankr. S.D.N.Y. 2000) ................................................................. 10

*In re:  BH S & B Holdings LLC*,
  426 B.R. 478 (Bankr. S.D.N.Y. 2010) ................................................................. 10

*Karelitz v. Damson Oil Corp.*,
  820 F.2d 529 (1st Cir. 1987)......................................................................... 14, 15

*LaSonde v. Seabrook*,
  89 A.D.3d 132 (1st Dep't 2011) .......................................................................... 19

*Mazzola v. Cty. of Suffolk*,
  143 A.D.2d 734, 533 N.Y.S.2d 297 (2d Dep't 1988)........................................... 10

*Moore v. Sutton Res., Ltd.*,
  No. 96 Civ. 7522 (RWS), 1998 WL 67664 (S.D.N.Y. Feb. 18, 1998)............... 14, 17

*Moore v. Sutton Res., Ltd.*, No.
  165 F.3d 14 (2d Cir. 1998) ................................................................................. 14

*Navarra v. Marlborough Gallery, Inc.*,
  820 F. Supp. 2d 477 (S.D.N.Y. 2011) ................................................................ 15

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
  102 F.3d 660 (2d Cir.1996) .................................................................................. 9

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
  784 F.2d 127 (2d Cir. 1986) ............................................................................... 13

*Olmedo v. Corizon P.C.*,
  No. 14 Civ. 3853 (AT HBP), 2015 WL 4002306 (S.D.N.Y. June 22, 2015)......... 17

*Patane v. Clark*,
  508 F.3d 106 (2d Cir. 2007) ................................................................................. 8

*Peter J. Solomon Co., L.P. v. Oneida Ltd.*,
  No. 09 Civ. 2229(DC), 2010 WL 234827 (S.D.N.Y. Jan. 22, 2010) ................... 12

*Prince v. Madison Square Garden*,
  427 F. Supp. 2d 372 (S.D.N.Y. 2006) ................................................................ 15

*Ragins v. Hosps. Ins. Co.*,
  22 N.Y.3d 1019 (2013).......................................................................................... 10

*Retail Assocs., Inc. v. Macy's East, Inc.*,
    245 F.3d 694 (8th Cir. 2001) ............................................................. 10

*Rogers v. Fashion Inst. Of Tech.*,
    No. 14 Civ. 6420 (AT), 2016 WL 889590 (S.D.N.Y. Feb. 26, 2016) ..................................... 17

*Rubin v. Manufacturers Hanover Trust Co.*,
    661 F.2d 979 (2d Cir. 1981) ............................................................. 10, 11

*UBS Sec. LLC v. Angioblast Sys., Inc.*,
    950 N.Y.S.2d 611 (Sup. Ct. 2012) ......................................................... 12

*Urban Retail Props. v. Loews Cineplex Ent. Corp.*,
    No. 01 Civ.8946 (RWS), 2002 WL 535479 (S.D.N.Y. April 9, 2002) ..................... 11

*Williams v. Calderoni*,
    No. 11 Civ. 3020 (CM), 2012 WL 691832 (S.D.N.Y. Mar. 1, 2012) ..................... 16

**Rules**

Fed.R.Civ.P. 8(a)(2) ............................................................................. 8

**Other Authorities**

Black's Law Dictionary 1179 (9th ed. 2009) ..................................... 10, 11

Webster's Third New Int'l Dictionary 2280 (2002) ..................................... 19

Defendant MidOcean US Advisor, LP ("MidOcean") respectfully submits this memorandum of law in support of its Motion to Dismiss Plaintiff's Complaint (the "Complaint" or "Compl.") with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiff Harvey & Company LLC ("Harvey") is claiming finder's fees of more than $1.5 million in cash plus up to 7% of the equity of KidKraft, LP ("KidKraft") based on a single 45-minute telephone call in April 2014 that Harvey arranged between MidOcean and KidKraft. Harvey asserts this claim even though (i) MidOcean did not acquire KidKraft until July 2015, nearly a year after the July 2014 termination of Harvey's agreement with MidOcean (the "Contract," attached as Exhibit 1) and (ii) MidOcean was able to acquire KidKraft only as a result of winning an auction run by an investment bank that had no connection to Harvey or to the single conversation Harvey facilitated between MidOcean and KidKraft.  Not surprisingly, Harvey's claim is foreclosed by both the plain language of the Contract and by governing New York law.

First, the plain language of the Contract provides that only obligations incurred prior to termination of the Contract survive the termination.  And the obligation to pay finder's fees is not incurred until the closing of an acquisition.  Here, MidOcean's acquisition of KidKraft closed in July 2015, nearly a full year after the Contract's termination, so any obligation to pay finder's fees to Harvey did not survive the termination.

Second, under governing New York law, a party seeking a finder's fee must demonstrate a direct, uninterrupted causal relationship between its introduction and the ultimate transaction.  Not only has Harvey failed to allege a causal connection in anything other than conclusory terms, it has in fact pleaded itself out of causation.  As Harvey acknowledges in its Complaint, MidOcean "acquired KidKraft through an auction process conducted by Lazard, an investment

bank engaged by KidKraft."  Compl. ¶ 25.  This intervening event breaks the chain of causation as a matter of law.

Finally, notwithstanding Harvey's lack of entitlement to finder's fees under the Contract, Harvey also fails to allege that it has met an additional threshold for a cash Transaction Fee. Under Section 4 of the Contract, Harvey would be entitled to such a fee only if it "Last Introduced" KidKraft to MidOcean within two years of the acquisition.  The Last Introduced hurdle could be met if Harvey either (i) provided material, non-public information that led directly to substantial discussions between MidOcean and a Target Company regarding a transaction or (ii) initiated "substantive discussions" regarding a transaction.  Harvey cannot and does not allege that it provided material, non-public information sufficient to support the first test.  Instead, Harvey euphemistically characterizes the preliminary discussions of the 45-minute April 2014 telephone call as "substantive."  But Harvey's description of that call belies its claim, as this Court has recognized regarding other, similar introductory calls.  As a result, Harvey is not entitled to any cash Transaction Fee under Section 4 of the Contract.

In sum, Harvey has not alleged the contractually-agreed requirement that the obligation to pay finder's fees be incurred prior to the Contract's termination, nor has it alleged direct causation, as is required under New York law for Harvey to earn finder's fees.  Harvey also has not pleaded facts demonstrating that it met the Last Introduced hurdle to its entitlement to a cash Transaction Fee.  As a result, MidOcean respectfully requests that the Court dismiss the Complaint in its entirety, with prejudice.

## STATEMENT OF FACTS[1]

### *The Contract Between MidOcean and Harvey*

MidOcean is a private equity firm.  Compl. ¶ 2.  Harvey is an acquisition search firm.  *Id.* In August 2011, MidOcean and Harvey entered into an agreement by which Harvey would provide services in order to assist MidOcean in making acquisitions.  *Id.* ¶ 8; Ex. 1, Preamble & § 1.  Harvey agreed, among other things, to regularly provide MidOcean with lists of "acquisition candidates."  Ex. 1, § 2.  Under the Contract, "[a]cquisition candidates approved by [MidOcean] for Harvey to approach, or otherwise introduced to [MidOcean] by Harvey, [were] deemed approved 'Target Companies.'"  *Id.*

To compensate Harvey for its services, MidOcean agreed to pay Harvey a retainer of $5,000 per month, which was to be applied against any Transaction Fees that may be earned.  *Id.* § 1; Compl. ¶ 10.  In addition to the $5,000 monthly fee Harvey received automatically during the Term, Harvey could also obtain three different forms of compensation upon the closing of a transaction between MidOcean and a Target Company.

### Harvey Could Earn a Transaction Fee, But Only If It Met the "Last Introduced" Hurdle

First, Section 4 of the Contract also provided Harvey an opportunity to earn a cash "Transaction Fee" upon the closing of a transaction with a Target Company.  Ex. 1, §4.

Because the amount of a Transaction Fee would be orders of magnitude greater than the $5,000 monthly fee, the parties carefully set the conditions upon which it would be due and the formula upon which to calculate it, as follows:

---

[1] Solely for purposes of this motion, all well-pled allegations of fact are assumed to be true.  However, conclusory allegations and legal conclusions are not entitled to any presumption of truth.  *See Gebhardt v. Allspect, Inc.*, 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.") (internal quotation, editing marks and citation omitted).

As compensation for Harvey's successful performance of the services described in Section 2 above, upon the closing of a transaction with a Target Company, provided the closing is within two years of the date the Target Company was Last Introduced (as defined below), Harvey shall receive a "Transaction Fee" ....

Ex.1, § 4; Compl. ¶¶ 10-11.

The Contract further defined the "Last Introduced" to include two alternative tests:

"Last Introduced" means, with respect to a Target Company, the date of [1] the most recent communication from Harvey to [MidOcean] during the Term providing new or updated material information (excluding publicly available information such as SEC filings) possessed by Harvey with respect to acquiring such Target Company which leads directly to substantial discussion between [MidOcean] and such Target Company regarding a transaction, or [2] the most recent date of substantive discussions during the Term initiated by Harvey between [MidOcean] or its affiliates and such Target Company regarding a transaction.

Ex.1, § 4 (emphasis and internal numbering added).  Thus, Harvey could only earn a Transaction Fee if it (i) provided material, non-public information that led directly to substantial discussions between MidOcean and a Target Company regarding a transaction or (ii) initiated "substantive discussions" between MidOcean and a Target Company regarding a transaction within two years of the closing of the transaction.

If earned, the Transaction Fee would be a graduated percentage of the "Aggregate Valuation" of the transaction pursuant to a formula, with the percentage starting at 5% of the Aggregate Valuation between $0 and $1,000,000 and going down to 1% for any Aggregate Value above $25,000,000.  *Id.*  The minimum Transaction Fee was $300,000, with any amount in excess of $300,000 reduced by retainer fees paid in the prior 12 months.  *Id.*

Harvey Could Earn Equity Interests Upon the Closing of a Transaction With a Target Company

Finally, Section 5 of the Contract addresses the possibility of Harvey earning an equity component of its fee upon the closing of a transaction with a Target Company.  Compl. ¶ 16; Ex. 1, §§ 5.1, 5.3.  It provided specific terms by which Harvey could potentially receive an equity

4

interest in a Target Company successfully acquired by MidOcean, subject to certain conditions. In particular:

> Upon the closing of a transaction with a Target Company, [MidOcean] shall cause Harvey or its designee . . . to receive a two percent (2.0%) equity interest, calculated on a fully diluted basis, in the legal entity through which the transaction is to be conducted ....

*Id.* § 5.1.

The Contract also provided Harvey with a limited option to purchase equity securities "on the same terms and conditions as [MidOcean] and its co-investors, up to five percent (5.0%) of the equity investment being made by [MidOcean] and its co-investors." *Id.* § 5.3. Harvey was not required to exercise this option. *Id.* As was the case with the Section 5.1 Equity Interest, MidOcean's obligation to offer Harvey this option under Section 5.3 arose only "upon the closing of a transaction with a Target Company." *Id.*

<u>Harvey Could Only Earn Transaction Fees And Equity Interests If the Closing Took Place During the Term</u>

The parties included one other important hurdle for Harvey to obtain any Transaction Fees or equity interests – MidOcean's obligation to pay would have to be incurred during the Term, which was defined in Section 1: "This agreement shall continue unless terminated by either party effective upon written (including email) notice to the other (the period during which this Agreement is in effect, the 'Term'), with such termination taking effect on the last day of the month in which such notice is provided." *Id.* § 1. The Contract contains no restrictions on permissible reasons for termination.

Upon termination, the Contract declared that any relationship between the companies would end, except "that the obligations incurred hereunder as of the expiration of the Term shall continue in full force and effect following such termination." *Id.* In other words, either company could terminate the Contract at any time and for any reason, but neither could escape

5

an obligation that had already been incurred prior to termination.  On the other hand, obligations that had not yet been incurred would not survive the termination.

### Over The Course of More Than A Year, Harvey Managed To Arrange Only One 45-Minute Call Between MidOcean and KidKraft

In or about June 2013, Harvey identified KidKraft, a privately held company, as a potential acquisition candidate after discussions with KidKraft's financial advisor.  Compl. ¶ 17.  As the Complaint acknowledges, KidKraft, was "not necessarily interested in a sale at the time," but its financial advisor at the time, John Peiser of Goldin Peiser & Peiser, nevertheless permitted Harvey to identify KidKraft to Harvey's customers.  *Id.* ¶¶ 17, 23.

On July 30, 2013, Harvey wrote to MidOcean to see if MidOcean was interested in learning about KidKraft as a potential acquisition candidate.  *Id.* ¶ 18.  MidOcean requested additional information about KidKraft on July 31, 2013, which Harvey provided that day.  *Id.* ¶ 19.  At this point, Harvey had not yet signed a non-disclosure agreement to obtain confidential KidKraft information for MidOcean.  *See id.* ¶ 22.  Three weeks later, MidOcean informed Harvey that it was interested in KidKraft as an acquisition candidate.  *Id.* ¶ 20.

The process then stalled.  Throughout the entire Fall of 2013, all of Harvey's communications on the topic were about "whether and when the parties should commence discussions concerning a potential acquisition by MidOcean of KidKraft."  *Id.* ¶ 21.  It was not until December 2013 that KidKraft and Harvey even executed a non-disclosure agreement.  *Id.* ¶ 22.

Then, the process stalled yet again as KidKraft's CEO spent "several months of deliberation."  *Id.* ¶ 23.  Finally, he agreed to have a conversation with Harvey and MidOcean.  *Id.*  That call, on April 29, 2014, lasted over 45 minutes and involved only preliminary

"discussions about the parties' respective businesses to determine if there was a strategic fit and whether an acquisition of KidKraft by MidOcean made sense." *Id.*

The Complaint does not identify any follow-up of any sort to the April 29, 2014 call.

On or about July 16, 2014, MidOcean notified Harvey that it was terminating the Contract. *Id.* ¶ 24. Under Section 1 of the Contract, the Term therefore ended on July 31, 2014. Ex. 1, § 1. At that time, MidOcean had not incurred any obligation to pay any Transaction Fee to or provide Harvey with any equity interest in KidKraft because there were not even ongoing discussions regarding a transaction, much less a closed transaction through which one could establish an Aggregate Value or determine a percentage of equity.

### After MidOcean Terminated the Contract, It Won An Auction and Acquired KidKraft

KidKraft eventually decided that it was interested in a sale. Rather than use its prior financial advisor, John Peiser, or contact MidOcean either directly or through Harvey, KidKraft instead hired Lazard, a prominent investment bank, to advise it. Compl. ¶ 25.

Lazard established an auction process for the sale of KidKraft to obtain the highest, best bid. *Id.* Without any involvement by Harvey in MidOcean's bidding process, KidKraft and Lazard ultimately selected MidOcean as the winning bidder, and MidOcean announced its acquisition of KidKraft on July 15, 2015, nearly a full year after it had terminated the Contract. *Id.*

Notwithstanding that MidOcean acquired KidKraft nearly a full year after the end of the Term through an auction process that did not involve Harvey, Harvey nevertheless demanded that MidOcean pay Harvey a Transaction Fee and provide Harvey with equity interests. *Id.* ¶ 26. MidOcean declined to pay Harvey fees it had not earned. *Id.*

7

## ARGUMENT

### I.    LEGAL STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

A Rule 12(b)(6) motion to dismiss a complaint "for failure to state a claim upon which relief can be granted" tests, among other things, the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement that the pleader is entitled to relief." *See Falso v. Ablest Staffing Servs.*, 328 F. App'x 54 (2d Cir. 2009); *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not shown that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

To survive a motion to dismiss, "detailed factual allegations" are not required, but Federal Rule of Civil Procedure 8(a)(2) demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation and, instead, calls for "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 679. A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted). The Federal Rules of Civil Procedure do not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* Put another way, the issue is "whether the claimant is entitled to offer evidence to support the claims." *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted).

8

Moreover, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555). The Federal Rules require plaintiffs to plead enough facts to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).

Finally, the Court may consider the facts alleged in the complaint, documents attached thereto as exhibits, such as the Contract, and documents incorporated by reference therein. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996) (explaining that a court deciding a motion to dismiss should consider only those facts alleged in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference).

## II.   HARVEY IS NOT ENTITLED TO ANY FINDER'S FEE BECAUSE MIDOCEAN DID NOT INCUR AN OBLIGATION TO PAY A FINDER'S FEE DURING THE CONTRACT'S TERM.

Section 1 of the Contract expressly provides that "the obligations incurred hereunder as of the expiration of the Term shall continue in full force and effect following such termination." Obligations that have not been incurred as of the expiration of the Term therefore necessarily do not survive the termination of the Contract unless the Contract otherwise provides for their survival. The Term ends on the last day of the month in which notice is provided. Ex. 1, § 1. Here, the Term ended on July 31, 2014 because MidOcean notified Harvey on or about July 16, 2014 that it was terminating the Contract. Compl. ¶ 24. As of then, MidOcean had not incurred

9

any obligation to compensate Harvey for a KidKraft acquisition that would not close until nearly one year later, on or about July 15, 2015. *Id.* ¶ 25.  It is a "well-recognized principle of New York law . . . that 'New York courts will enforce a termination clause as written.'"  *See*, *e.g.*, *Retail Assocs., Inc. v. Macy's East, Inc.*, 245 F.3d 694, 699 (8th Cir. 2001) (applying New York law and collecting citations).  As a result, Harvey's claims in this litigation must fail as a matter of law.

An obligation is a "legal or moral duty to do or not do something," or a "formal, binding agreement or acknowledgement of a liability to pay a **certain** amount or to do a **certain** thing for a  particular person or set of persons."  Black's Law Dictionary 1179 (9th ed. 2009) (emphasis added).[2]  The requirement of certainty is particularly important so that there is clarity on what obligations have been incurred and whether they have been met.

While the amount of an obligation must be clear, it is possible to have a "contingent" or "conditional" obligation that does not become due until another event transpires.  In those situations, "[o]bligations for payments that are contingent on other events occurring are incurred when the contingency is triggered."  *In re:  BH S & B Holdings LLC*, 426 B.R. 478, 484 (Bankr. S.D.N.Y. 2010); *accord In re Le Cafe Creme, Ltd.,* 244 B.R. 221, 233-34 (Bankr. S.D.N.Y. 2000) ("An obligation . . . is incurred when a debtor becomes legally bound to pay.") (collecting cases; citations and internal punctuation omitted).  Put simply, no obligation for payment is incurred until the contingency triggering the obligation occurs.  *See*, *e.g.*, *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 990 (2d Cir. 1981) (rejecting argument that obligation was incurred upon execution of guaranty because "[u]ntil the loans were made, there existed only a

---

[2] "[I]t is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."  *Mazzola v. Cty. of Suffolk*, 143 A.D.2d 734, 735, 533 N.Y.S.2d 297, 297 (2d Dep't 1988) (citation omitted).  *See*, *e.g.*, *Ragins v. Hosps. Ins. Co.*, 22 N.Y.3d 1019, 1022 (2013) (using dictionary definition of contractual term not defined in contract).

framework through which [the guarantors] might incur obligations, but they had not done so yet.").

Moreover, when an "obligation was specifically bargained for to be contingent upon a future event," rather than accrued over time (such as rent), the obligation is incurred at the time the contingent event occurs. *Urban Retail Props. v. Loews Cineplex Ent. Corp.*, No. 01 Civ.8946 (RWS), 2002 WL 535479, at *6-8 (S.D.N.Y. April 9, 2002) (Sweet, J.).

Under the Contract here, MidOcean had not incurred any obligation to pay a fee to Harvey for the KidKraft acquisition when the Term ended.  As an initial matter, an obligation by definition requires a certain amount to be paid, Black's Law Dictionary at 1179, and there was no certain amount of cash due under Section 4 or equity interests due under Section 5.  Those certain amounts could not be calculated until the transaction was completed so that the Aggregate Value portion of the Transaction Fee formula and the equity in the acquired entity could be determined; the payments would then be due "upon the closing of [the] transaction with a Target Company."  Ex. 1, §§ 4, 5.1, 5.3.  And even if the amounts of cash and equity due at the end of the Term were certain, the obligation to pay was specifically bargained for to be contingent on a future event, *i.e.* the closing of a transaction, and therefore was not incurred as a matter of law until that contingent event took place.  *See*, *e.g.*, *Rubin*, 661 F.2d at 990; *Urban Retail Props.*, 2002 WL 535479, at *6-8.  Thus, MidOcean did not incur an obligation to compensate Harvey for the eventual KidKraft acquisition during the Term because there was no obligation at all, much less a contingent obligation that had not yet been triggered.  And because MidOcean had incurred no obligation during the Term of the Contract, there was no such obligation to survive under Section 1 once the Contract was terminated.

This conclusion is reinforced by comparing the Contract to other finder's fee contracts, where the parties have chosen to extend the period when a finder's fee obligation can be incurred past the contract's termination through "tail" provisions.[3] And there can be no doubt that Harvey and MidOcean are sophisticated parties who could have drafted a "tail" provision for the finder's fee here, had they so chosen.[4] Indeed, the parties knew exactly how to use such a clause because they did so in Section 11 of the Contract, which expressly extends MidOcean's non-solicitation obligation beyond the date of termination. *See* Ex. 1, § 11 ("***During the Term and for the 12 month period subsequent thereto***, [MidOcean] shall not solicit for employment any directors, officers or employees of Harvey ...." (emphasis added)). Neither Section 4 nor Section 5 contains similar "tail" language that extends the time when a payment obligation arises beyond the date of termination, confirming that the parties never intended to create a post-termination obligation for MidOcean to pay fees and equity.

---

[3] *See, e.g.*, *Bison Capital Corp. v. ATP Oil & Gas Corp.*, 10 Civ. 0714 (SHS), 2011 WL 8473007, at *2 (S.D.N.Y. March 8, 2011) ("Bison shall be entitled to the fees set forth in Paragraph 2 above in the event [ATP] consummates or enters into an agreement or arrangement providing for a Capital Transaction . . . at any time within twelve months following termination of this Agreement; and no termination of Bison's engagement hereunder shall affect [ATP's] obligation to pay fees and expenses to the extent provided for herein ...." (emphasis omitted)); *Peter J. Solomon Co., L.P. v. Oneida Ltd.*, No. 09 Civ. 2229(DC), 2010 WL 234827, at *1 (S.D.N.Y. Jan. 22, 2010) ("PJSC shall be entitled to its full fees under Section 3 hereof in the event that any Transaction is consummated at any time prior to the expiration of one year after such termination, or a letter of intent or definite agreement with respect to any Transaction is executed at any time prior to one year after such termination (which letter of intent or definitive agreement subsequently results in the consummation of such Transaction at any time)"); *Houlihan Lokey Howard & Zukin Cap., Inc. v. Protective Grp., Inc.*, 506 F. Supp. 2d 1230, 1233 (S.D. Fla. 2007) ("If this Agreement is terminated by [Defendant] for any reason, and [Defendant] consummates, or enters into an agreement in principle to engage in (and which subsequently closes), a Transaction within 12 months after such termination date with any party which (i) Houlihan Lokey identified, contacted or with whom [Plaintiff] or [Defendant] had discussions regarding a potential Transaction during the term of this agreement, or (ii) reviewed the information memorandum or any other written materials prepared by [Plaintiff] concerning [Defendant] and/or the proposed Transaction, [Plaintiff] shall be entitled to receive its Transaction Fee upon the consummation of such Transaction as if no such termination had occurred."); *UBS Sec. LLC v. Angioblast Sys., Inc.*, 950 N.Y.S.2d 611 (Sup. Ct. 2012) ("The Tail Period provision stated that 'UBS shall be entitled to payment in full of the applicable Transaction Fee referred to in this Section 2 if at any time prior to the expiration of nine months after the Term the Company enters into an agreement that subsequently results in the consummation of a Sale Transaction.'").

[4] As described in Section IV below, the Last Introduced provision in Section 4 is an additional hurdle to a Transaction Fee applicable during the Term. By its very terms, it precludes Harvey from obtaining a Transaction Fee unless one of two tests are met. As a result, it is not a "tail" provision that extends the obligation beyond the term.

The conclusion that the Contract means what it says – that MidOcean has no obligation to pay Harvey for deals that do not close during the Term – is made even more clear by comparison to the alternative theory, that Harvey is entitled to equity interests if MidOcean ever closes a deal with a Target Company, even if the Term is over.[5]  It cannot be the case that even after the Contract is terminated, MidOcean can never make a deal with any former Target Company without having to pay Harvey an equity interest.  If Harvey is entitled to a Section 5.1 equity interest for a deal that closed almost one year after Contract termination, then Harvey could similarly claim it is entitled to a Section 5.1 equity interest in a deal that closes ten years after the Contract termination –- or fifty years later, for that matter.  It is a settled principle of New York law that contracts must be construed to avoid such absurdity.  *See*, *e.g.*, *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) ("Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.").

Under Section 1 of the Contract, only obligations incurred as of the expiration of the Term survive termination.  Uncertain, future contingencies do not.  The plain terms of Section 1 should therefore be the beginning and the end of this entire dispute:  the parties did not enter into a never-ending relationship.  Harvey therefore is not entitled to a Transaction fee under Section 4 of the Contract or any equity interests under Section 5 of the Contract.

## III.   HARVEY CANNOT ESTABLISH A CAUSAL RELATIONSHIP BETWEEN ITS ACTIONS AND MIDOCEAN'S ACQUISITION OF KIDKRAFT.

Harvey's complaint also fails to state a claim because Harvey does not and cannot establish a direct causal relationship between any of its actions and MidOcean's acquisition of KidKraft.  Without a clear cause-and-effect connection, New York law forecloses Harvey's claims.

---

[5] Unlike the Transaction Fee, there is no additional Last Introduced hurdle in Section 5.

There is a great deal of New York case law governing the payments of finder's fees.  To establish liability under a finder's fee agreement such as this one under New York law, the finder (in this case, Harvey) must establish that there was "a causal relation between the introduction of the parties and the ultimate conclusion of the transaction."  *Moore v. Sutton Res., Ltd.*, No. 96 Civ. 7522 (RWS), 1998 WL 67664, at *4 (S.D.N.Y. Feb. 18, 1998) (collecting cases), *aff'd*, 165 F.3d 14 (2d Cir. 1998); *see also Karelitz v. Damson Oil Corp.*, 820 F.2d 529, 531 (1st Cir. 1987) (Breyer, J.) (explaining that under New York law a "finder must show that the deal that was made resulted and flowed directly from the original introduction") (citation and internal quotation omitted); *Edward Gottlieb, Inc. v. City & Commercial Commc'ns PLC*, 606 N.Y.S.2d 148, 150-51 (1st Dep't 1994) (holding that the plaintiff was "not entitled to a 'finder's fee'" because "[t]here must be some 'continuing connection between plaintiffs initial efforts and the merger that came about'") (citations and emphasis omitted); *Ferghana Partners Inc. v. Bioniche Life Scis. Inc.*, 939 N.Y.S.2d 740, 2011 WL 5385095, at *9 (Sup. Ct. 2011) ("Plaintiff fails to meet its burden of demonstrating any continuing causal connection.").[6]  Indeed, even "but-for" causation is insufficient; there must be a direct, uninterrupted causal relationship, *i.e.*, "the final deal which was carried through [must have] flowed directly from the introduction."  *Moore*, 1998 WL 67664, at *4 (internal quotations and alterations omitted).  This standard of causation can be satisfied where parties continue negotiation "without intervention of a third-party and without any indication that either party lost interest."  *Id.* at *6.  But where there has been third-party intervention following the breaking off of earlier communications, no direct causal relationship exists.  *Id.*

---

[6] The courts in each of these cases applied the causation requirement as a requirement of New York law, not as a result of specific contractual language requiring causation.

14

Here, Harvey has not alleged a continuing casual connection; instead, it alleges only one 45-minute call it arranged in April 2014, fifteen months before MidOcean's acquisition of KidKraft in July 2015.  And Harvey's own complaint also acknowledges an intervening cause that occurred long after that single telephone call it arranged – MidOcean "acquired KidKraft through an auction process conducted by Lazard, an investment bank engaged by KidKraft." Compl. ¶ 25.  This auction process is the paradigmatic intervening cause that precludes the award of a finder's fee.  *Cf. Karelitz*, 820 F.2d at 531 (explaining that contractual causation principles are the same as negligence principles).  Because it appears on the face of the complaint it may be considered on this motion to dismiss.

Tacitly acknowledging that causation is a necessary element of its finder's fee claim, Harvey pleads "upon information and belief" that "MidOcean's participation in that auction process, as well as its successful acquisition of KidKraft through that process, were direct results of Harvey's introduction of MidOcean to KidKraft in the months before the auction process began."  Compl. ¶ 25.  This conclusory allegation does not rescue Harvey's claim.

As an initial matter, the Court can disregard this allegation because it is wholly conclusory. *See Gebhardt*, 96 F. Supp. 2d at 333 ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.").  And Harvey's resort to "information and belief" magnifies the inadequacy of Harvey's allegation because while *Iqbal* did not abolish pleading on information and belief, allegations made on information and belief must be "accompanied by a statement of the facts upon which the belief is founded."  *Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 477, 485 (S.D.N.Y. 2011) (quoting *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006)) ; *see also Williams v. Calderoni*, No. 11 Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1,

2012) (finding pleading on information and belief insufficient where plaintiff "points to no 'information' that will render statements any more than a speculative claim").  Harvey provides no facts upon which this belief is founded, so its allegation fails to meet Rule 8(a) pleading standards.

Moreover, the suggestions Harvey makes on information and belief do not meet *Iqbal*'s plausibility test.  The sequence of events makes this clear.  For ten months, from June 2013 to April 2014, the only discussions Harvey fostered were whether MidOcean and KidKraft should even have a discussion:  "The subject of all of these communications was whether and when the parties should commence discussions concerning a potential acquisition by MidOcean of KidKraft."  Compl. ¶ 21; *see generally id.* ¶¶ 17-23.  Finally, "[a]fter several months of deliberation" by KidKraft's CEO, *id.* ¶ 23, there was a single 45-minute call in April 2014 "about the parties' respective businesses to determine if there was a strategic fit and whether an acquisition of KidKraft by MidOcean made business sense."  *Id.* ¶ 23.  And then, there were no further discussions in the next 75 days, before MidOcean notified Harvey that it was terminating the Contract on July 16, 2014.  *Id.* ¶ 24.  After that, rather than consummate a transaction with MidOcean as a result of the 45-minute conversation in April 2014, KidKraft instead hired Lazard to conduct an auction.  Finally, one day short of a full year after the termination of the Contract, MidOcean announced on July 15, 2015 that it had acquired KidKraft following that auction.

Reviewing this chronology, Harvey cannot show causation under New York law.  First, Harvey does not even allege that there was further interest in a transaction in the 75 days between the initial phone call and the termination of the Contract; it therefore alleges no facts suggesting that "MidOcean's participation in the auction process" was the "direct result[]" of Harvey's introduction of MidOcean to KidKraft.  And, as weak as that legally-irrelevant

connection might be, Harvey's leap to the legally-significant conclusion that this introduction directly caused MidOcean's "successful acquisition of KidKraft through that process" defies all plausibility.  There is not a single allegation in the Complaint that suggests how a single 45-minute call about a strategic fit directly caused MidOcean to have the winning bid in an auction process that concluded in a transaction more than one year later.  Indeed, the fact that KidKraft hired an investment bank, Lazard, to conduct an auction rather than start negotiations directly with MidOcean belies any claim that Harvey's introduction directly caused the final transaction. Because MidOcean's acquisition of KidKraft did not "flow[] directly from [Harvey's] introduction," *Moore*, 1998 WL 67664, at *4, particularly in light of the obvious alternative explanation that MidOcean acquired KidKraft as a result of an independent auction process, Harvey is not entitled to any compensation from MidOcean as a matter of law.  *See Twombly*, 550 U.S. at 567 (reversing denial of motion to dismiss where "obvious alternative explanation" of causation existed); *Rogers v. Fashion Inst. Of Tech.*, No. 14 Civ. 6420 (AT), 2016 WL 889590, at *7 (S.D.N.Y. Feb. 26, 2016) (dismissing claim that did not plausibly allege causation); *Olmedo v. Corizon P.C.*, No. 14 Civ. 3853 (AT HBP), 2015 WL 4002306, at *4 (S.D.N.Y. June 22, 2015) (same); *Estronza v. RJF Sec. & Investigations*, No. 12-CV-1444 NGG JO, 2014 WL 5877942, at *9-10 (E.D.N.Y. Nov. 12, 2014) (dismissing claims where intervening event provides "an exceedingly plausible alternative cause").

The Court should therefore dismiss Harvey's Complaint in the entirety because the Complaint cannot and does not allege causation, as required for Harvey to earn finder's fees under either section 4 of Section 5 of the Contract.

**IV.    HARVEY IS NOT ENTITLED TO A TRANSACTION FEE UNDER SECTION 4 BECAUSE IT DOES NOT ALLEGE THAT IT MET EITHER "LAST INTRODUCED" HURDLE.**

Notwithstanding that Harvey is not entitled to any finder's fee because MidOcean had no obligation to pay any such fee during the Term and because Harvey has not and cannot plead the required direct causation, Harvey also is not entitled to a Transaction Fee under Section 4 because it cannot and does not allege that it met either prong of the Last Introduced hurdle.

Section 4 of the Contract provides that Harvey shall receive a Transaction Fee "upon the closing of a transaction with a Target Company, provided the closing is within two years of the date the Target Company was Last Introduced ...."  The key term is "Last Introduced," which is defined to mean:

> the date of the most recent communication from Harvey to [MidOcean] during the Term ***providing new or updated material information*** (excluding publicly available information such as SEC filings) possessed by Harvey with respect to acquiring such Target Company ***which leads directly to substantial discussions*** between [MidOcean] and such Target Company ***regarding a transaction***, or ***the most recent date of substantive discussions during the Term*** initiated by Harvey between [MidOcean] . . . and such Target Company regarding a transaction.

Ex.1, § 4 (emphasis added).  Thus, there are two ways Harvey could meet this hurdle:  (i) by providing material, non-public information that led directly to substantial discussions between MidOcean and a Target Company regarding a transaction or (ii) by initiating "substantive discussions" regarding a transaction.  Harvey's Complaint does not properly allege that it met either test.

**A.    Harvey Does Not Attempt to Allege That It Met The First Hurdle.**

In its Complaint, Harvey does not even attempt to allege that it has met either part of the first test.  The only information mentioned in the Complaint that KidKraft provided to MidOcean due to Harvey's outreach was on July 31, 2013, Compl. ¶ 19, before Harvey and KidKraft (but not MidOcean) entered into a November 2013 non-disclosure agreement.  *Id.* ¶ 22.  Harvey

cannot and does not suggest that this information was either non-public or material.  And Harvey likewise does not characterize the single 45-minute conversation that ensued nine months later, on April 29, 2014, as either a direct result of the information Harvey provided nor as "substantial discussions . . . regarding a transaction."

### B.  Harvey Does Not Allege A Substantive Discussion Sufficient To Meet The Second Hurdle.

Harvey suggests only that it has met the second Last Introduced test, *i.e.* that it initiated "substantive discussions" between MidOcean and KidKraft "regarding a transaction."  The sole allegation supporting this theory is that there was a 45-minute call on April 29, 2014 that involved "specific discussions about the parties' respective businesses to determine if there was a strategic fit and whether an acquisition of KidKraft by MidOcean made business sense."  *Id.* ¶ 23.  But despite Harvey's optimistic characterization of these preliminary discussions as "substantive," they do not qualify under either the definition of the word or under relevant precedent.  "Substantive" means "important, real, or meaningful."  Webster's Third New Int'l Dictionary 2280 (2002).  Treating this short, preliminary call as "important, real, or meaningful" would improperly render as the word "substantive" as mere surplusage in the phrase "substantive discussions . . . regarding a transaction."  *LaSonde v. Seabrook*, 89 A.D.3d 132, 138 (1st Dep't 2011) (explaining that terms of contract should not be rendered mere surplusage).  Nor do the allegations of the Complaint demonstrate a conversation "regarding a transaction," which would include at the very least some discussions of basic transaction terms such as valuation, structure or timing.  Furthermore, it is simply not plausible that this short, preliminary call was substantive in the context of a transaction, given that the only written information MidOcean had received about KidKraft was at least nine months old and was provided before the entry into the non-disclosure agreement between KidKraft and Harvey.  Indeed, when this call took place, there

was no non-disclosure agreement between KidKraft and MidOcean itself, nor can the Complaint allege that such a non-disclosure agreement was signed.

The Court here is not writing on a blank slate regarding preliminary conversations about acquisitions.  In a case with remarkably similar facts, the Southern District of New York has rejected any suggestion that talks like those here amount to "substantive discussions."  In *Goodridge v. Harvey Grp., Inc.*, 778 F. Supp. 115 (S.D.N.Y. 1991), after the defendants/counter-claimants decided that they were interested in acquiring a target company, they met with officials from the target company, including Goodridge.  *Id.* at 119.  The parties "discussed the nature and performance" of the target company, and representatives of the target company informed the potential buyer that the company "had just completed the most successful fiscal year in its history."  *Id.*  Goodridge did not participate in any of the further discussions that led to a transaction.  *Id.*  The potential buyer later brought fraud claims against Goodridge and others, contending that they participated in a scheme to defraud the potential buyer.  The Court rejected that claim, in part based on its conclusion that Goodridge "never took part in substantive discussions or negotiations concerning the proposed merger."  *Id.* at 125.  The Court's conclusion that the "general observations about the nature of the business and the strong performance [the target company] had attained in the most recent fiscal year," *id.*, were not "substantive discussions" applies equally to Harvey's allegations here regarding an introductory "discussions about the parties' respective businesses to determine if there was a strategic fit." *See also I. Oliver Engebretson, Inc. v. Aruba Palm Beach Hotel & Casino*, 587 F. Supp. 844, 848-49 (S.D.N.Y. 1984) (finding that meeting at which defendants attempted to modify agreement was not of "substantive importance" sufficient to confer personal jurisdiction over defendant).

In sum, Harvey has not alleged facts supporting a claim that it met either prong of the

Last Introduced test.  As a result, Harvey is not entitled to a Transaction Fee under Section 4.

## **CONCLUSION**

For the foregoing reasons, MidOcean respectfully requests that the Court dismiss the

Complaint in its entirety, with prejudice and permit MidOcean to make an application for costs

and expenses, including reasonable attorneys' fees, under Section 10 of the Contract.


Dated:  July 28, 2016
    New York, New York

 

Respectfully submitted,

**COHEN & GRESSER LLP**


By:  /s/ Daniel H. Tabak
    Mark S. Cohen
    mcohen@cohengresser.com
    Daniel H. Tabak
    dtabak@cohengresser.com
    Sang Min Lee
    slee@cohengresser.com
    800 Third Avenue, 21st Floor
    New York, NY  10022
    Phone:  (212) 957-7600
    Fax:  (212) 957-4514

    *Attorneys for MidOcean US Advisor,*
    *LP*

21